**Stanley Ellsworth PERKINS,
Petitioner-Appellant,**

v.

**Eugene LeFEVRE, Superintendent,
Respondent-Appellee.**

**No. 311, Docket 79–2105.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1979.

Decided Feb. 18, 1981.

Robert L. King, New York City (Debevoise, Plimpton, Lyons & Gates, New York City, of counsel), for petitioner-appellant.

Janet Cunard, Asst. Dist. Atty., Westchester County, White Plains, N. Y., Carl A. Vergari, Dist. Atty. of Westchester County, White Plains, N. Y., for respondent-appellee.

Before LUMBARD,* MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner-appellant Stanley Ellsworth Perkins, a state prisoner, appeals from a judgment of the United States District Court for the Southern District of New York, Morris E. Lasker, *Judge*, denying his petition for a writ of habeas corpus. Petitioner contends that his state conviction violated due process of law because of the false testimony of one of the prosecution's witnesses. On the basis of the paper record before it, the district court determined that, even assuming the prosecutor knew the testimony was perjurious, there was no reasonable likelihood that the falsehood would have affected the judgment of the jury. Because we conclude that the record as to the underlying facts was undeveloped and that those facts may not justify the conclusion that there was no reasonable likelihood that the fairness of petitioner's trial was unaffected, we vacate the judgment and remand for further consideration after an evidentiary hearing.

---

* Pursuant to Local Rule § 0.14(b), the Honorable J. Edward Lumbard was designated to sit in place of the Honorable John F. Dooling who died on January 12, 1981.

## FACTS

Perkins was convicted of felony murder, robbery, and grand larceny in New York Supreme Court, Westchester County in 1975, and is currently serving a sentence of twenty-five years to life. The case arose out of a robbery by two men of a supermarket on September 17, 1974, during which a customer who identified himself as a police officer was shot and mortally wounded. The prosecution's case rested on three types of evidence: (1) eyewitness identification by three persons of petitioner as one of the robbers (four others called as witnesses by the prosecution could not identify petitioner); (2) the testimony of police officers who recounted certain statements made by Perkins during the police interrogation that followed his arrest; and (3) the testimony of one Melvin Jones, a government informant who was an acquaintance of petitioner and his alleged accomplice, Joseph Davis, with respect to statements allegedly made to him by Perkins and Davis.

At issue on this appeal are questions relating to the prior criminal record of Jones, whose principal testimony was that on September 18, 1974, Perkins or Davis stated to him that they had just "iced" a very important person at a grocery store.[1] With respect to his own past, Jones testified that he had spent seventeen days in jail on Hart's Island for parking offenses, that he had never been convicted of a crime, that he had been arrested only once, and that there were no charges then pending against him. Perkins contends that this testimony was perjurious and that the prosecutor deliberately refused to furnish him with Jones's rap sheet which would have revealed the falsity of the testimony.

The record in the state court, which was reviewed by the district court in connection with the present petition (no evidentiary

---

1. Davis was subsequently convicted of shooting the police officer. *See People v. Davis*, 43 N.Y.2d 17, 400 N.Y.S.2d 735, 371 N.E.2d 456 (1977), *cert. denied*, 435 U.S. 998, 98 S.Ct. 1653, 56 L.Ed.2d 88 (1978).

hearing was held in the district court), indicates the following sequence of events. In December 1974, Perkins's attorney moved to require the prosecutor to produce the criminal records of any witness the prosecution intended to call at trial. This motion was denied without prejudice to its renewal at trial. On April 10 or 17, 1975, the prosecutor received a rap sheet for Melvin Jones.[2] The trial commenced on April 14. On the morning of April 16, Perkins's counsel specifically requested the rap sheet of Jones, who by then had been identified by the prosecutor as an intended witness. The prosecutor stated that he did not have a rap sheet for Jones and did not know whether or not Jones had a rap sheet. That afternoon Jones testified as described above. On April 17, the prosecutor advised the court and the defense that he had just received a rap sheet, but that he did not know whether or not it was the rap sheet of the Melvin Jones who had testified. He stated that if it was in fact the rap sheet of the Melvin Jones who had testified, it might be necessary "in the interest of fairness" to recall Jones to the stand. On April 18, the prosecutor advised the court and the defense that he had satisfied himself that Melvin Jones had testified accurately:

> ... I had convinced myself through my investigation that Melvin Jones did actually testify accurately here when he stated he had no prior conviction. If I should ever find out that I was wrong, I would be the first one to rush to the Court and to say let's recall Melvin Jones and actually clear this up ....

On April 22, at 11:30 a.m., the jury returned its verdict finding Perkins guilty of the crimes charged. At 4:00 p.m. that day, the prosecutor received a "certificate" of Jones's conviction. The prosecutor did not, however, "rush to" advise the court or the defense of this development. They did not learn of it until May 21, 1975, when, at his sentencing, Perkins continued to insist that Jones had lied at the trial. At this point the prosecutor finally revealed that Jones had "record convictions," which the prosecutor maintained were not "real" convictions because Jones was an informant for law enforcement agencies at the times he was convicted. Perkins was sentenced on May 21. The rap sheet was finally turned over to his counsel several days later.

The rap sheet not only reflected that Jones had spent seventeen days in jail on Hart's Island for parking violations, but also revealed that he had twice been convicted of felonies—once for conspiracy to commit theft from interstate shipments and once for criminally concealing stolen property—and that he had been arrested on at least two other occasions, including one arrest for criminal possession of a stolen car and one for unauthorized use of a vehicle. The rap sheet gave no indication that the latter two arrests had been resolved.

Perkins's post-conviction motion to vacate his conviction was unsuccessful, as were his appeal to the Appellate Division and his attempt to appeal to the New York Court of Appeals. Having exhausted his state remedies, he then filed his present petition in the district court for habeas corpus.

The district court, adopting the report of the magistrate to whom the matter had been referred, denied the petition on the grounds that there was sufficient evidence to convict Perkins even without Jones's testimony, and that there was no " 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' " (Opinion at 2.) The magistrate's report pointed out that Jones's credibility had already been impeached by cross-examination showing that his memory of the September 18 conversation was flawed and by the revelation that he had been jailed for parking offenses. The report reasoned that

---

2. In connection with post-conviction proceedings in the state court, a member of the district attorney's office submitted an affidavit on information and belief, based on the records of that office and conversations with various members of that office, stating that the prosecutor had obtained the rap sheet for Jones on April 10. This affidavit also placed the receipt of the rap sheet on the day after Jones's testimony—which the affidavit stated was April 9. The trial transcript reveals that Jones testified on April 16, and that on April 17, the prosecutor advised the court that he had just received the rap sheet.

[a]lthough the moral culpability which the layman attaches to parking violations and delinquency in this regard is undoubtedly of a lesser degree than that attached to convictions for theft from interstate shipments or carriers, a jury might well infer a certain defectiveness in character from laxity reaching the point where imprisonment is required.

(Magistrate's Recommendation at 15.) The magistrate concluded that any additional impeaching effect gained by evidence of Jones's convictions would have been minimal.

## DISCUSSION

There are two sets of legal principles, which overlap one another to some degree, that may govern Perkins's claims. First, it is well established that a prosecutor's knowing use of false testimony violates the due process clause of the Fourteenth Amendment. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 238 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935); *Taylor v. Lombard*, 606 F.2d 371, 374–75 (2d Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980); *United States ex rel. Washington v. Vincent*, 525 F.2d 262, 267 (2d Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). *See United States v. Agurs*, 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). Due process requires not only that the prosecutor avoid soliciting false testimony, but that he not conceal it, and that he not allow it to go uncorrected when it has occurred. These standards apply whether the subject of the falsehood goes to the merits of the case or only to the credibility of the witness:

"A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."

*Napue v. Illinois, supra*, 360 U.S. at 269–70, 79 S.Ct. at 1177; *Taylor v. Lombard, supra*, 606 F.2d at 375.

Second, when a defendant has requested that the prosecutor produce specific information that is material to the case against him, due process requires that such production be made. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see United States v. Agurs, supra*, 427 U.S. at 104–06, 96 S.Ct. at 2397–99. Although *Brady* dealt with material that was exculpatory in nature, its principle extends to evidence relating to a material witness's credibility, *Giglio v. United States, supra*, if the suppressed evidence might have affected the outcome of the trial. *See United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2398. If the prosecutor has suppressed requested evidence that is material, the merits of the constitutional claim do not depend on whether or not the prosecutor acted in good faith. *United States v. Agurs, supra*, 427 U.S. at 105, 110, 96 S.Ct. at 2398, 2401.

When the prosecutor has knowingly allowed false testimony to go uncorrected, or has failed to produce requested evidence in his possession, we must attempt to determine whether there was any reasonable likelihood that it affected the fairness of the defendant's trial. *Napue v. Illinois, supra*, 360 U.S. at 271, 79 S.Ct. at 1178; *United States ex rel. Washington v. Vincent, supra*, 525 F.2d at 267. *See United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2397; *cf. id.* at 111, 96 S.Ct. at 2401.

In the present case, it appears that, as the magistrate found, "Jones's testimony was quite important to the prosecution's case" and that it "was probably a substantial factor in the jury's decision." (Magistrate's Recommendation at 13–14). However, we are not as confident as the magistrate that the jury would view convictions for conspiracy to commit interstate theft, and criminal concealment of stolen property in essentially the same light as a delinquency in payment of parking fines. Nor can we say that the jury was likely to view Jones's past conspiracy to steal and concealment of stolen goods in the same light as a failure of memory as to which of two per-

sons in conversation with him made a particular statement. In short, we can envision that upon the revelation of Jones's convictions the jury could have viewed Jones as a man who lied on the witness stand about his past, or as a man who had twice been found guilty of dishonest acts in the past. With this information the jury might well have assessed Jones's credibility in a different light than it did knowing only that he had failed to pay his parking tickets.

Our review is hampered, however, by the absence of factual determinations below. Respondent has taken the position that the convictions revealed on the rap sheet are not really convictions, but merely window-dressing to protect an undercover informer. Whether or not these were real convictions is a question that apparently has not been the subject of an evidentiary hearing in any court. In addition, if these were bona fide convictions, the extent to which the prosecutor knew the testimony was false is not clear. His statements to the state court are troubling in at least two respects. First, the statement that it might be necessary to recall Jones to the witness stand "in the interest of fairness" if he determined that the rap sheet he had in hand was for the Melvin Jones who had testified, suggested that the prosecutor was aware that Jones's testimony had not been truthful. Second, the prosecutor's suggestion that the rap sheet he had in hand might have been for a different Melvin Jones seems at best disingenuous: it hardly seems possible that the prosecutor genuinely believed that *two* Melvin Joneses had been jailed for seventeen days on Hart's Island for parking violations.

None of the key facts was actually determined by the district court.[3] The court appears to have assumed that the magistrate found that Jones committed perjury at the trial. It stated that "[t]he Magistrate found that '[t]he government either knew or should have known that [Jones' testimony] was perjury.' " (Opinion at 2.) The magistrate's premise, however, was merely that it "appear[ed]" that Jones had perjured himself, and the magistrate proceeded on that assumption. He did not determine whether in fact Jones's testimony was false. Nor did he determine the facts as to the prosecutor's knowledge. Perkins asked for an evidentiary hearing as to these issues. We do not believe his claims can appropriately be evaluated without one.

Accordingly, we vacate the denial of the petition for habeas corpus and remand to the district court for an evidentiary hearing on the facts with respect to (1) Melvin Jones's actual criminal record, (2) the failure of the prosecutor to make Jones's record available to the defense in time to use it at the trial, and (3) whether the prosecutor knew that Jones's testimony with respect to his criminal record was false. The district court should reconsider the petition in light of findings of fact made after such a hearing. Jurisdiction is retained in the Court of Appeals.

---

**3.** The state court's rejection of Perkins's claims is not binding on the district court. After describing the parties' contentions and quoting an affidavit by the prosecutor stating that Jones "does not consider himself to have been convicted of a crime," the state court found simply as follows:

> Upon all the papers and proceedings had herein and upon the court's recollection of the proceedings upon the trial, the Court makes the following findings of fact:
> There was no evidence adduced at the tri known by the People to be false;
> there was no improper or prejudicial conduct upon the part of the People;
> there is no new evidence which, if available at the trial, would require a reversal of the judgment;

there was no deprivation of defendant's *Brady* rights.

*People v. Perkins*, No. 74–00977–01, at 3 (Sup.Ct. West.Co. 1976). Since the state court did not explore in any detail the factual underpinnings of the claim or the possible prejudicial impact of the alleged constitutional violations, it is entirely proper for the district court to make its own assessment of the facts and apply the appropriate governing principles. *Sumner v. Mata*, —— U.S. ——, ——, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981); *Taylor v. Lombard, supra*, 606 F.2d at 375; *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978); *United States ex rel. Williams v. La Vallee*, 487 F.2d 1006, 1010–11 (2d Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).